J-S10031-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: P.R.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.R.D., FATHER | |
| | No. 1649 MDA 2025 |

Appeal from the Decree Entered October 24, 2025
In the Court of Common Pleas of Lebanon County
Orphans' Court at No: OC-25-0072

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:　　　　　　**FILED: JUNE 4, 2026**

This termination of parental rights case returns to us following remand for the orphans' court to conduct a needs and welfare analysis pursuant to 23 Pa.C.S. § 2511(b).  We affirm.

## Background

On June 10, 2025, Lebanon County Children and Youth Services (CYS) petitioned to terminate the parental rights of N.R.D. (Father) to P.R.D. (Child).  Child was born in March 2024 and tested positive for cocaine at birth.  The orphans' court explained:

> Father was not present at the hospital at the time of Child's birth and [CYS] could not reach him.  [CYS] looked into potential kinship resources including the paternal grandfather and paternal grandmother.  However, paternal grandmother was already caring for … other children and stated she was unable to care for a newborn at the time.  Paternal grandfather was also not willing to care for Child.  [CYS] was granted verbal emergency custody of Child on March 6, 2024.  Eventually [CYS] was able to get in

contact with Father after placement occurred. However, Father tested positive for cocaine at that time.

Upon discharge from the hospital, Child was placed in a foster home on March 7, 2024. On March 8, 2024, [CYS] filed an Application for Emergency Protective Custody. Following a shelter care hearing held on March 11, 2024, [CYS] was granted continued legal and physical custody of Child. … Following a [d]ependency [h]earing on October 28, 2024, the [c]ourt found Child dependent…. Child has remained in the same [CYS] approved foster home since placement on March 7, 2024. ...

At the[ permanency review] hearings, the [c]ourt found … Father had minimal compliance with the Permanency Plan [and] alleviating the circumstances that necessitated [Child's] placement….

Orphans' Court Opinion (OCO I), 12/17/25, at 4-5 (citations omitted).[1]

The orphans' court held a termination hearing on October 24, 2025.[2] CYS presented testimony from the caseworker supervisor, Payge Hess, and Father testified in opposition to termination. After the hearing, the court entered the decree terminating Father's parental rights, and Father appealed. In addition to challenging grounds for termination under Section 2511(a), Father challenged whether termination served Child's best interest under Section 2511(b). Father claimed the orphans' court failed to "properly

---

[1] OCO I was filed on December 17, 2025, but is incorrectly dated June 19, 2024. *See* OCO I at 2.

[2] Although Child was approximately 20 months old at the time, separate counsel appeared on behalf of Child's best and legal interests. *See* N.T., 10/24/25, at 4-5. Child's legal counsel stated that she "would normally be asking what the child [wants to] represent," but "here the child is too young to speak." *Id.* at 89-90.

consider" Child's bond with Father and Child's bond with her siblings. *See Father's Brief at 8-9.*

We previously determined that the evidence supported grounds for termination of Father's parental rights under Section 2511(a)(1). *See In re P.R.D.*, No. 1649 MDA 2025, 2026 WL 1067323 (Pa. Super. filed Apr. 20, 2026) (unpublished memorandum) (*P.R.D. I*); *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (this Court "need only agree with [the orphans' court's] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights."). However, we remanded the case for the orphans' court to conduct a needs and welfare analysis pursuant to Section 2511(b). The orphans' court has provided its reasoning for finding that termination is in Child's best interest. We agree with the reasoning.

## Discussion

This Court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). Our Supreme Court has stated:

> Because [orphans'] courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing [the] courts' decisions in this arena, appellate courts defer to [the] courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse [orphans'] courts only when that discretion has been breached or when the law has been misapplied.

*Id.* at 1129.

Pursuant to Section 2511(b), the orphans' court must prioritize the developmental, physical and emotional needs and welfare of the child. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Supreme Court explained:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and [the federal Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.").

*Int. of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. The analysis must be made on a case-by-case basis. *Id.*

In concluding that termination would best serve Child's needs and welfare, the orphans' court explained:

> Ms. Hess' testimony … established that the foster parents have met … Child's developmental, physical, and emotional needs. … Ms. Hess testified that the foster parents have met Minor Child's need for love, support, comfort, and stability. …
>
> By contrast, Ms. Hess testified that Father has not met … Child's needs for love, protection, guidance, or support. At the time of

the termination hearing on October 24, 2025, Father had not visited … Child for more than a year….

Based on the testimony presented, we find that the foster parents are the only source of love, nurture, comfort, security, and stability … Child has ever known. The foster parents have cared consistently for … Child since she was three days old and they are "extremely bonded." … Child looks to the foster parents for love and reassurance, rather than Father. The foster parents prioritize … Child and her wellbeing, are actively involved in her life, and are an adoptive resource. In short, the foster parents have, essentially since … Child's birth, undertaken every parental duty that Father has abandoned and have successfully endeavored to provide … Child with the stable and loving life that she deserves.

Orphans' Court Opinion (OCO II), 5/1/26, at 4-5 (citations omitted).

The evidence supports the orphans' court's reasoning. Ms. Hess testified that throughout Child's dependency, Father "simply hasn't been there to provide" for Child, while Father admitted he had not visited Child since June 2024. N.T., 10/24/25, at 20, 76. According to Ms. Hess, Father's lack of communication "made it very difficult to really engage [Father] with the different services" CYS offered. *Id.* at 22. CYS did not know where Father lived, and Father failed to establish stable housing and employment. *Id.* at 16-17. Ms. Hess believed that Father failed to meet Child's needs because "he simply hasn't been there to provide those things that [C]hild needs." *Id.* at 20. She added, "I don't believe [Child] knows" Father. *Id.* at 22.

Ms. Hess confirmed the foster parents were an adoptive resource. *Id.* at 33. She relayed that Child is the only child in the home, and "doing really well." *Id.* at 18, 21. She described Child and the foster parents as "extremely bonded." *Id.* at 20. Ms. Hess stated:

> They do everything together. [The foster parents] are very patient and very cautious. If they see any little thing wrong, they're immediately trying to make sure that [Child is] okay and she's meeting all milestones. They very much prioritize [Child] and make sure she's fully healthy.

> \*\*\*

> [Foster parents] go on walks [with Child]. They'll go to the park and go on swings. They go visit any type of museum that would be interesting to [Child]. They are very involved with [Child].

> \*\*\*

> [T]hey are just actively there with her. Anytime there is discomfort or she's upset, they're there to support her and give her reassurance. [T]heir entire world [revolves] around [Child].

*Id.* at 20-21. When CYS's counsel asked Ms. Hess whether "there would be a severe impact" on Child if Father's rights were terminated, Ms. Hess answered "[n]o." *Id.* at 23.

Father testified that he was aware of his goals, but did not "contact [CYS] because they do not acknowledge me at all." *Id.* at 76. Father stated that he was "staying at a friend's house" while waiting to move into an apartment. *Id.* at 45-46. He claimed he had space for Child "where I'm currently at." *Id.* at 59. However, when the orphans' court asked Father for his address, Father replied: "I don't know the address off the top of my head." *Id.* at 60. Father confirmed that he had not visited Child since June 2024. *Id.* at 48. He stated, "a couple of times where we have meetings set up … I [went] and they're like, the meeting was an hour ago. … So I come … all the way here … for no reason because I missed the appointment for the time that we set." *Id.*

- 6 -

Pertinently, the guardian *ad litem* (GAL) advocated for termination of Father's parental rights. The GAL reported that Child was "thriving" and "well bonded with the foster parents." ***Id.*** at 90. The GAL also stated that Child had "no bond" with Father. ***Id.*** at 92.

Child has lived with foster parents since she was a few days old, and there is no evidence of Child having a bond with Father or her siblings. This Court has stated repeatedly that when "there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." ***In re C.E.D.H.***, 338 A.3d 1010, 1025 (Pa. Super. 2025) (citations omitted).

For the above reasons, the orphans' court did not err or abuse its discretion in finding that termination serves Child's needs and welfare. Thus, we affirm the decree terminating Father's parental rights.[3]

Decree affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/4/2026

---

[3] To the extent we vacated the decree upon remand in ***P.R.D. I***, the decree is reinstated.